EXHIBIT N

U.S. District Court

Northern District of California

Oakland Division

Analysis and Opinion

Court Appointed Expert

REINHOLD HORST DAUSKARDT

Professor of Materials Science and Engineering

Associate Department Chair, Materials Science and Engineering

Professor, by courtesy, Department of Mechanical Engineering

Professor, by courtesy, Department of Surgery

Affiliated Professor, Biodesign Program, Stanford University

496 Lomita Mall, Durand Bldg., Rm. 121

Stanford University

Stanford, CA 94305 - 4034

Regarding

Tessera, Inc. v. Advanced Micro Devices, Inc. et al., No. 4:05-cv-04063

Siliconware Precision Indust. Co. v. Tessera, Inc., No. 4:08-cv-03667

ChipMOS Technologies Inc. v. Tessera, Inc., No. 4:08-cv-03827

Advanced Semiconductor Eng., Inc. v. Tessera, Inc., No. 4:08-cv-03726

Spansion, Inc. v. Tessera, Inc., No. 4:10-cv-04954

Tessera, Inc. v. Motorola, Inc. et al., No. 4:12-cv-00692

Powertech Technology, Inc. v. Tessera, Inc., 4:10-cv-00945

and related cases

1

compliant material that accommodated the claimed displacements. He goes on to say that "In modern-day terminology, we would call such a layer a package substrate." This demonstrates exactly how the names of components of the package evolve naturally; they follow obviously on from one another. This evolution is part of an obvious progression based on prior art.

*A Doorknob Mounted on a New Door is Not a New Invention*

This consideration of anticipation may be elucidated with the following simple analogy that I believe is an oft-quoted tenet in the teaching of patent law. Consider the invention of a doorknob and its design and function fully prescribed by patent claim limitations. If the doorknob is removed from the door by cutting a section of the door surrounding the doorknob from the door, and this section of the door containing the doorknob is subsequently mounted onto another door, then this does not represent a new invention. It is still a doorknob operating with the same components, design and function, and new claim limitations could not be constructed. The doorknob on the new door in components, design and function has remained unchanged, and the fact that it is mounted on a new door does not make it a new invention. It could have been fully anticipated by the claim limitations of the original doorknob.

The problems related to damage caused from differential thermal expansion between semiconductor chips, their packages and the PCB to which they are mounted were very well known and understood at the time of the claimed invention. As already noted, early solutions involved using flexible connections and compliant materials between the chip and the PCB which would accommodate the differential displacements and relieve mechanical stresses very effectively. Two examples are shown in **Figure 3**. Putting a box around these strategies and design configurations and calling them a new "doorknob" is misleading.

It is therefore my opinion that any packaging engineer with ordinary skill in the field of microelectronic packaging would have been able to anticipate the claimed invention from the extensive set of prior art examples. The fact that packages were continually made smaller and with more complexity is not relevant with respect to the novelty of the claimed invention since by simple dimensional scaling, the chips and the entire package components and their connections could have been made smaller and more complex without requiring any further innovation or invention from this basic configuration.

*The Inside-the-Package Solution to an Outside-the-Package Problem is Not Novel or Unique and Could Have Been Anticipated from Prior Art*

The above observations have bearing on the argument made in the Plaintiffs' expert report by Ivey that the claimed invention is *unique* and *novel* because it solves problems of differential thermal expansion outside of the package with an inside the package solution. Just like the newly mounted doorknob, its function and design have not changed because it is mounted onto a new door, and the problem of closing, opening and locking of the new door is now accomplished with a solution inside of the newly "packaged" doorknob. This does not make the claimed invention new, or novel, or something that could not have been anticipated by reference to the prior art.

*Further Examples of Prior Art in Microelectronic Packaging Assemblies That Anticipate the Claims of the Patents-In-Suit*

Similar examples of prior art that would suggest invalidity based on anticipation have been cited by the Defendants' experts and summarized in their legal brief. The patents-in-suit do not disclose any required combination of elastic modulus and thermal expansion coefficient for the compliant package substrate which would be required, among other things, to define the claimed invention involving movement from external forces. I therefore agree with Defendants that the Freyman patent (U.S. Pat. No. 4,700,276) which discloses a semiconductor package with a package substrate structure including a "flexible" polymeric dielectric layer along with "flexible" bond wires anticipates all of the claims in the patents-in-suit. The fact that a ceramic substrate is present is in my opinion not relevant since if forms only one layer of the substrate and, while it may be elastically stiff, it represents only one contribution to the stiffness of the substrate that is in any event not specified in the claims limitations.

Two other patents (Japanese Pat. Publ. 61-177759 and Japanese Pat. Publ. No. S59-194460) are cited by the Defendants as having compliant elements in packaged chips that would allow a packaging engineer with ordinary level of skill to anticipate the movable claim limitation in the same manner as described in the patents-in-suit. I agree with this observation.

## Obviousness

I understand that patent claims are invalid if the claimed invention would have been obvious to a person of ordinary skill in the field and that the court has the ultimate responsibility of making this determination. My intent in this section is to give my opinion on the question of obviousness to the court based on several factual observations that I have formed based on my experience and knowledge.

In forming my opinion regarding obviousness, I have been careful not to use the benefit of hindsight. I have used references of prior art and my own teachings and experience in the area of thermo-mechanical behavior of materials that date well before the date of the claimed invention. In doing so I have attempted to represent the thinking of a person of ordinary skill in the field of microelectronic packaging at the time of the claimed invention. Finally, new teachings and technologies developed after the date of the claimed invention have also not influenced my opinion on the question of obviousness.

> *The claimed inventions are invalid because at the time of the invention they would have been obvious to a packaging engineer with ordinary level of skill in the field.*

Notwithstanding my comments in the section above regarding the manner in which the claimed invention could have been anticipated from prior art and embodiments of the invention existed in microelectronic packages prior to the date of the claimed invention, it is also my opinion that the claimed invention would also have been obvious to a packaging engineer with ordinary level of skill in the field.

As I have already described in the background section, the basic scientific and engineering understanding of thermal expansion in materials and complex device structures like microelectronic packages was very well developed by the 1990's and should be considered a "classic" field in the mechanics of materials and part of the education of microelectronic packaging engineers. Both analytical and computational methods existed that could provide very detailed analysis of the stresses and strains that would result from differential thermal expansion in complex structures made of different materials and these were already been used in the design of microelectronic packages.

Furthermore, the application of a large number of engineering strategies to mitigate the effects of differential thermal expansion were well know and practiced in many trades and engineering fields.  These include the application of flexible elements and compliant materials that can accommodate the differential thermal expansion strains and limit stresses.  In other words, from tradespeople to engineers, the problems related to differential thermal expansion in engineering were well known, and strategies involving flexible elements and compliant layers to accommodate movement related to differential thermal expansion were very well developed. I have already documented how pervasive these engineering strategies were at the time of the claimed invention and the level of teaching that would have existed for a packaging engineer with ordinary level of skill in the field.

Packaging engineers with the equivalent of bachelor degrees in mechanical engineering, materials science and engineering, microelectronic engineering, physics, and related fields would have been well versed in the theory of the thermal expansion of materials, of the basic mechanics frameworks by which the resulting stresses and strains could be analyzed, and in the strategies to mitigate the effects of differential thermal expansion strains on generating stresses.

Several strategies existed at the time of the claimed invention, one involving matching CTE, another involving constraining the materials with strong joints or interfaces but with the development of higher elastic stresses, and finally involving the introduction of compliant layers and flexible elements that can accommodate the thermal expansion displacements.  Every one of these strategies would involve thermal expansion displacement differences between the silicon semiconductor chip and the PCB, and varying levels of external forces imposed on the package terminals that would in turn be related to the mechanical stress in the terminal joint to the PCB (usually the solder joint) and resulting elastic displacements (movement) of the terminals in response to these stresses.  In other words, the claimed movement in the present litigation is always present in microelectronic package assemblies.

In deciding if a strategy were truly discovered in the current claimed inventions that was not an obvious solution based on such wide experience and prior understanding, if must be sufficiently distinct and novel from any of the well-known strategies involving compliant layers and elements.  Valid claim limitations would therefore need to separate the claimed movement from the same type of movement that is always present.

It is my opinion, taking all of the materials supplied in the expert reports, together with my own understanding of the field, that the present claims do not represent anything new but rather completely obvious applications of existing strategies.

The "teaching" of prior art that would have been well known to packing engineers, along with most other mechanical and materials design engineers, would have rendered the inclusion of flexible substrates and compliant wires, exactly along the lines of the presently claimed invention, not only obvious, but almost mundane from an engineering perspective.

> *The Inclusion of Compliant Layers to Provide Stress Relief in Microelectronic Assemblies Dates Back Many Decades*

In the case of semiconductor devices, these teaching date back many decades, for example, this comment is taken from the Handbook of Semiconductor Electronics, A practical Manual Covering the Physics, Technology, and Applications of Transistors, Diodes, and Other Semiconductor Devices in Conventional and Integrated Circuits, edited by Lloyd P. Hunter, 3rd Edition, McGraw-Hill, initially published in 1956, with subsequent editions in 1962 and 1970. The comment relates to encapsulation and packaging of metal-insulator electronic subassemblies and states: "A glass preform and oxidized metal parts are fused together at approximately $1000^{o}C$. On cooling there is some stress buildup at the seal because of small differences in expansion coefficients, but the cushioning effect of the thin oxide transition layer between metal and glass prevents breaking of the seal." Here, the introduction of the more compliant transition glass layer provides relief of stress by the "cushioning effect" obtained through accommodating the differential thermal expansion displacements.

In other words, more than 20 years before the claimed invention in the 3rd Edition of a practical technical handbook and possibly as early as 1956 in the 1st Edition, the teaching of the application of compliant layers in electronic packaging of electronic components to relieve stresses resulting from thermal expansion mismatch were already documented.

> *The Teachings from Prior Art Patents on Compliant Layers, Flexible Elements and Decoupling from the PCB Terminals to Accommodate Thermal Displacements and Reduce Stress*

claimed invention in the patents-in-suit. The announcement for the Kiver award mentions the compliance of the package, and the citation for the SEMI award acknowledges "their combined efforts to commercialize Micro Ball Grid Array technology" but makes no mention of the claimed inventions in the patents-in-suit.

It is also my understanding from evidence presented in the defendants expert reports that manufacturing of the Micro Ball Grid Array has not been widely adopted since it is simply not as reliable as claimed.

## Written Description and Enablement

I understand that for a patent claim to be valid, the patent must contain an adequate written description of the claimed invention. I also understand that to be valid, a patent claim must be enabled at the time it was originally filed by containing a sufficiently full and clear description of the claimed invention. The intent is to ensure that a person of ordinary skill in the field at the time would have recognized the invention as claimed and also would be able to make and use the full scope of the invention.

> *The Patent Claims are Invalid as they do Not Contain an Adequate Written Description and they are also Not Enabled since a Person of Ordinary Skill in the Field Could Not Make and Use the Invention as Claimed*

It is my conclusion that the patent claims are invalid as they do not contain an adequate written description, because, among other things, the movement related to external force that is intended to relieve stress is not defined in a manner in which someone of ordinary skill in the field of microelectronic packaging could recognize or understand and implement with any engineering certainty. Further, it is my conclusion that the patent claims are not enabled since, without excessive experimentation, a person of ordinary skill in the field could not determine the extent of movement related to external forces that would be required to make and use the invention as claimed.

It is my understanding that the court has previously interpreted "movement" and "movable" as claimed in the patents as only those displacements involving the application of external forces to the extent that the displacements appreciably relieve mechanical stress. I agree with this

determination, since it correctly separates the movement or displacement that is central to the claimed invention, from all of the possible movements in the package that may arise from other sources. The question then is to determine if the patents provide an adequate written description and enablement of these specific movements that not only would allow understanding of the invention, but that could also be used to make full use of the invention. In what follows, I will explain to the court why I do not believe this has been satisfied.

> *The Movement Related to External Forces to Appreciably Relieve Mechanical Stress is Not Adequately Described and Separated from Other Movement That Would be Needed to Recognize and Use the Invention as Claimed*

I have already explained why the thermal displacements of the package substrate terminals and the PCB terminals are not the same and that other displacements are always needed to make up the difference (**Figure 2(a)**). This would have been true *whatever* strategy for packaging was adopted (stiff package substrates or compliant package substrate layers, decoupling the chip from the package substrate or bonding it strongly, CTE matching or not) before the time of the claimed invention, and would also have been true using the strategies of the claimed invention.

Even in the case of exact CTE matching of the package substrate and the PCB, the rest of the package, the package design, the chip attachment, the PCB structure and design, and non-uniform temperatures in the package assembly and the PCB, would all affect the thermal displacements and make them unequal. To make up the difference, other displacements related to the application of internal and external forces and the development of stresses in the package assembly are always present and these cannot all be related to the claimed invention.

Even if there is a temperature of the package assembly at which there are no internal and external forces and stresses (see discussion on a stress-free state on pgs. 91-92, Fan report) and therefore no displacements related to those forces, then if the temperature changes, thermal expansion differences will develop and so will forces and stresses. These will result in displacements but they are not related to the claimed invention and they do not relieve stress.

The challenge, therefore, is to determine if the patents adequately describe the displacement (movement) related to external forces inherent to the claimed invention that appreciably relieve mechanical stress, but also *separate* them from not only the thermal displacements but also the

other displacements that will always be related to internal forces and stresses inherent in a package assembly made of different materials. This would be a minimum requirement for a person of ordinary skill in the field of microelectronic packaging to *recognize* the invention as claimed, and further description would be required to make full use of the invention.

The problem of properly describing the required movement is compounded by the following observation. If the package substrate is made less stiff using increasingly compliant layers and decoupling the substrate from the influence of the stiff chip as claimed in the patents-in-suit, then *larger* thermal displacements would naturally result for the package terminals which would result in *smaller* differences between the thermal displacements of the package substrate and PCB terminals. This would generally mean that *less* (not more) of the required movement would occur to make up the difference between the package substrate terminal and the PCB terminal displacements, and *lower* corresponding external forces would be involved.

So the claimed invention becomes most effective where the difference in thermal expansion displacements between the package substrate and PCB terminals become *smaller* and where the required movement would be minimized making it increasingly difficult to properly define claim limitations that separate all of the displacements and make them useful and meaningful from an engineering perspective in package design.

The dilemma is related to the increased thermal expansion of increasingly compliant package substrate layers leading to better matching of the package substrate and the PCB terminal thermal displacements. Furthermore, any increase in the claimed movement can only be related to *increasing* stresses in the package assembly and solder joints as I have already explained in some detail. Put yet another way, the larger the difference in thermal displacements, the *larger* will be the needed claimed movement to make up the difference which will result in *larger* external forces and *higher* stresses in the solder joint. Stress *relief* from the required movement in the claimed invention can *only* be defined by comparison to some (arbitrary) reference package.

I note parenthetically that if use is made of a very compliant package substrate, including, for example, a sufficiently thick layer made of a material like silicone rubber that is less stiff than the PCB and has a larger thermal expansion coefficient, then the thermal displacement of the package substrate terminals might actually be *larger* than those of the PCB terminals, and forces

40

(of opposite sign) and stresses will again *increase* in the solder connection but will act to *decrease* the movement (displacement) of the package substrate.

For the limitations of the patent claims to be properly described with an adequate written description that would allow understanding of the invention and to be enabled so that full use can be made of the invention, a packaging engineer would need to know what specific movement is required separate from all of the other movements discussed above, and they would also need to know what minimum amount of the required movement is required to appreciably relieve mechanical stress. The written description in the patents-in-suit does not provide this explanation.

The claim limitations in U.S. Patent 5,679,977 have only vague references to "movable" and "deform to accommodate movement" and "terminals being movable with respect to the chip to compensate for thermal expansion." Similarly in U.S. Patent 5,852,326 there is an inadequate description of the required movement with vague references to "terminals are movable with respect to said chip" and "flexible to facilitate the movement of the terminals" and "compliant layer permits independent movement of said terminals" and "terminals are movable in a direction parallel" and "terminals are movable in a direction perpendicular."

*The Descriptions Would Not Enable a Packaging Engineer to Understand the Invention*

These descriptions provide no limitations on the claimed movement and would not enable a packaging engineer to understand the required movement separate from all of the other movements inherent in a package assembly, or to make full use of the invention. It is clear from the sophisticated analyses provided in the expert reports that agreement cannot even be reached by experts in the field of microelectronic packaging on the required movement, how to calculate it, and if it is related to *any*, let alone appreciable, stress relief.

In the discussion above we noted a range of movements or displacements that are inherent in any package assembly and the fact that they cannot all be related to the claimed invention. These include thermal displacements and other displacements (elastic, plastic, viscoelastic, etc) that are associated with internal and external forces, but are not related to the claimed invention because they would be present in all package assemblies (with or without the claimed invention) and are not related to the appreciable relief of mechanical stress in the solder joint.

41

There is nothing in the written description that would allow a person of ordinary skill in the field to understand the required movement, how to separate it from all of the other displacements, and what minimum amount is needed. This is an indefensible omission from the claim limitations and, so broadly construed, has the effect of including all movement related to internal and external forces in a package assembly that is not related to thermal expansion as part of the claimed invention. Clearly this is an untenable interpretation since it could be applied to any and every microelectronic package assembly.

> *Appreciable Relieve of Mechanical Stress is Not Adequately Described and Full Use Could Not be Made of the Invention as Claimed*

In addition to the lack of an adequate written description of, and claim limitations for, the required movement, there is also an inadequate written description and claim limitation of the required mechanical stress relief. A packaging engineer with ordinary skill in the field could not use the claimed invention to achieve "appreciable" stress relief, because they would not know how large "appreciable" should be, and, as I will explain below, they would not know what reference mechanical stress level to select from which stress relief should be determined.

The required movement related to external forces can only be present if such forces and associated stresses exist in the solder joint, and the movement can only get larger with increasing stress, and so stress relief can never be described with reference to a single package assembly. The requirement regarding mechanical *stress relief* can only be made by comparison to a different reference package containing large external forces and high associated stresses. In this reference package the claimed movement may be more limited, although, depending on the package design, the movement may be greater in the presence of the larger stresses. Note that it is not possible for the reference package, or any package assembly for that matter, to exhibit none of the required (claimed) movement.

So for the stress relief requirement to work a reference package must be *assumed* and the stress relief determined by comparison to the reference package. However, the details of such a reference package from which initial stresses are to be calculated is not described and never mentioned in the claim limitations, rendering the interpretation of stress relief to be without any limits or bounds.

Let me explain why this can lead to an "unbounded" conclusion regarding stress relief. If a reference package must be assumed then this leaves great uncertainty as to the choice of stiffness, thermal expansion coefficient and design of the package substrate, and how the package substrate is connected to the chip, and how the chip contacts are connected to the package substrate terminals including the flexibility of the wire connections.

The plaintiffs' experts have chosen to analyze a hypothetical package assembly containing a package substrate structure that replaces the compliant layer (typically the die attach and solder mask layers) with stiffer materials that are strongly bonded to the stiff chip. Higher stresses may be present in these types of package assemblies with less (but not zero) movement related to the deformation of the stiffer materials. In fact, the plaintiffs did not actually demonstrate that stresses were significantly higher in these reference packages as I discuss below.

This type of reference package was selected by the plaintiffs' experts because it is similar in construction to the alleged infringing packages. However, other than considering the separate question of infringement, there is no particular basis for this selection of this reference package if the question of the validity of the invention is being questioned. No reference is specified in the patent claims.

The plaintiffs' could equally have chosen an even stiffer package substrate where the stresses might have been even higher, and the movements even less (although again not zero). This would have allowed an even larger stress relief to be claimed. However, it would not, of course, provide an adequate limitation on the claimed stress relief since by changing the reference package selection any stress relief could be demonstrated in the package using the claimed invention. This would not have anything to do with the use of the invention in the package but rather with the selection of the reference package.

This would essentially leave an unbounded description of the possible stress relief. Not even the experts in the field of microelectronic packaging and the thermomechanical behavior of materials involved in the present litigation can agree on the extent of stress relief, and as noted in the supplementary report of Dasgupta, if the stress actually increases in the accused packages rather than decreases for some reference comparisons. A person of ordinary skill in the field could not make a meaningful determination of the extent of stress relief needed to make full use of the invention as claimed.

The concept of a reference package ("baseline" package in some of the expert reports) is misleading since it suggests a special relationship to the package containing the claimed invention which *enables* the stress relief claim limitation through selection of the reference, rather than the operation of the invention. The reference or baseline package is an arbitrary reference. The reference or baseline package selected for detailed analysis by the Plaintiffs' experts is also not representative of prior art packages and has never been manufactured. It should not be thought of as identical in all aspects except for the inclusion of the claimed invention as I discuss in the Infringement section that follows. Defining the stress relief claim limitation around comparisons to an arbitrary reference package is fundamentally flawed.

I would note finally that in these types of hypothetical comparison there would also be significant technical challenges in quantitatively determining the amount of stress relief. For example, using finite element analysis (FEA) computations, very complex stress distributions are obtained, and in principal, by choosing different computed stress components, almost any stress relief could be claimed.

It is not difficult to think of ways in which the claims construction could have included valid limitations on the required movement and the extent of stress relief. For example, the displacements could have been related to external forces imposed on the package substrate terminals. The field of the thermo-mechanical behavior of microelectronic packages was well advanced at the time of the invention and packaging engineers of ordinary skill in the field would have had the understanding and methods to adequately describe the invention so that it could be understood by others and to construct meaningful claim limitations to enable the full use of the scope of the invention. None of these descriptions or limitations is provided.

> *Valid Claim Limitations Based on Other Damage or Fatigue Parameters are Not Adequately Described and Full Use Could Not be Made of the Invention as Claimed*

If, on the other hand, the amount of stress reduction is to be determined based on improved fatigue resistance of the solder joints in the package assembly, then once again, this would need to be defined and described since fatigue behavior is very sensitive to a range of parameters. The number of fatigue loading cycles, the stress and strain amplitude, whether low cycle fatigue or high cycle fatigue is to be considered, or any number of other variables that can affect fatigue