EXHIBIT O

1

1           UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3

TESSERA, INC.,                    )
4                                  )
          Plaintiff and           )
5         Counter-Defendant,      )
                                   )
6    vs.                          )   No.  4:12cv00692 cv
                                   )        4:05cv04063 cw
7    ADVANCED MICRO DEVICES,      )
     INC., et al,                 )
8                                  )
                                   )
9         Defendants and          )
          Counter-Claimants.      )
10                                 )
                                   )
11                                 )
                                   )
12   AND RELATED CASES            )
13                                 )
                                   )

14

15                    - - - -

16                   VOLUME I

17           EXPERT WITNESS TESTIMONY OF

18              REINHOLD DAUSKARDT

19               (Pages 1 - 211)

20     Held at the Law Offices of Sidley Austin, LLP

21       1001 Page Mill Road, Palo Alto, California

22           Monday, March 31, 2014, 10:35 a.m.

23                    - - - -

24   REPORTED BY:  ELAINA BULDA-JONES, RPR, CSR #11720

25

1   The time is 11:26 a.m.

2           (Whereupon, a brief recess was taken.)

3           THE VIDEOGRAPHER:  We are back on the

4   record.  The time is 11:35 a.m.

5   BY MR. ANDERSON:

6       Q.   Okay.  So back on the record,

7   Dr. Dauskardt, and directing your attention again to

8   Exhibit 7 to the deposition.  It is Dr. Schaper's

9   claim chart for the 1989 OMPAC package.

10          Do you have an opinion as to whether the

11  OMPAC package anticipates each and every element of

12  the claims that are asserted in this suit?

13      A.   I agree with the opinions of Schaper.

14      Q.   Okay.  And just for the sake of the

15  record, is it your opinion that the 1989 OMPAC

16  package anticipates all of the asserted claims of

17  the '977 patent?

18      A.   I do.

19      Q.   And, again, for the record, is it your

20  opinion that the 1989 OMPAC package anticipates all

21  of the claims of the '326 patent?

22      A.   Yes, it is.

23      Q.   Okay.  So we are done with that one.

24          Let me go now to a portion of Schaper's

25  report.  We have marked this as Exhibit 8 to the

1      Dr. Dauskardt, back to Exhibit 8 of the deposition,

2      which is the report of Dr. Schaper that we looked at

3      briefly earlier.

4              And in particular let me direct your

5      attention your attention to page 14, Paragraph 42.

6      If you could read to yourself Paragraph 42 of

7      Exhibit 8, then I will ask you a question about it.

8           A.   I have read it.

9           Q.   I would like you, sir, to apply the --

10     Paragraph 42 to the opinions that you have reached

11     in this case.

12              Using the standards set forth in Paragraph

13     42, is it your opinion that the asserted claims of

14     the patents-in-suit are invalid for indefiniteness?

15          A.   Yes.

16          Q.   In your own words, sir, why is that?

17          A.   They simply don't provide any definition

18     or any limitations on the required movement and how

19     to separate that movement from other movements that

20     would be inherent in the package.

21              And so, with respect to the definiteness

22     test, somebody of ordinary skill in the field simply

23     would not understand the limitations.

24          MR. ANDERSON:   Okay.  So I think it would

25     be convenient, if it is okay with you,

1    the Court on the case.

2         Q.   Can you give me an example of some kind of

3    information that you felt, with your experience on

4    the case, you didn't need to spend a large amount of

5    time reviewing?

6         A.   Well, for example, the prosecution history

7    of the patents.  I did look through it.  I on

8    occasion went back to consult some aspect of it.

9              But to spend a large amount of time on

10   that large amount of information, ended up, I

11   believe, not being relevant to what I was doing.

12        Q.   And why is that?  Why did you find the

13   prosecution history to not be particularly relevant

14   to what you were doing here?

15        A.   Well, I was working with the final

16   patents, and certainly understanding the background

17   to the patent and the choice of terminology, knowing

18   something about the prosecution history would have

19   been important.

20             But to spend all of my time looking at the

21   prosecution history at the expense of time spent

22   looking at your expert reports or the defense expert

23   reports would not have been productive, I believe.

24        Q.   Did you identify anything in the materials

25   that you had that, had you more time, you would have

1    liked to look at more closely?

2         A.   No, I -- at the end, I felt that I had a

3    good -- or I had enough information and that there

4    was nothing that I had been provided with that, if I

5    would have had more time to consider that, that I --

6    it would have affected my opinion.

7         Q.   You felt you had sufficient time to review

8    all the materials provided to render a reliable

9    opinion in this case; is that fair?

10        A.   I think that's a fair way of putting it,

11   yes.

12        Q.   Did you review the decision of the

13   International Trade Commission in its investigation

14   against Qualcomm and ST, among others, as part of

15   your work in this case?

16        A.   As I mentioned in the earlier questions

17   that related to that, I did review the ITC opinion

18   along with other tribunals and judgments that were

19   made on the case.  So I was aware of them.  I am

20   aware of them.  The answer is yes.

21        Q.   Okay.  Did you give any weight to the

22   decision of the International Trade Commission in

23   the -- the '605 investigation, the investigation

24   against Qualcomm and ST, in reaching your opinions

25   in this case?

1       A.    I gave it weight inasmuch as if there were

2    information that I had obtained -- had seen or

3    obtained from reading it that would scientifically

4    have affected my opinion, then I would have given

5    that weight, yes.

6          However, just because some tribunal or

7    some other procedure had made a ruling in this case

8    would not have by itself affected my opinion.

9       Q.    Was there any analysis of -- let's start

10   with validity -- by -- you understand -- let me back

11   up.

12         In the International Trade Commission

13   proceeding where ST was a party, the parties there

14   challenged the validity of the Tessera patents.

15         Do you understand that?

16      A.    Yes, I do.

17      Q.    Okay.  Was there any part of the analysis

18   by the International Trade Commission or the Federal

19   Circuit reviewing the International Trade Commission

20   on ST and others' arguments of validity that you

21   found helpful to the work you did on this case?

22         MR. ANDERSON:  Object to form.

23         THE WITNESS:  I wouldn't say helpful.

24   There was a period in my discovery on this case that

25   any information was useful in terms of helping me

1    understand.

2           And certainly, in that context, the

3    information that I saw from those cases and those

4    tribunals was useful, but it didn't -- it didn't

5    affect my opinion.

6    BY MR. OLSON:

7        Q.   Were there any analyses performed by the

8    International Trade Commission or the Federal

9    Circuit reviewing the International Trade Commission

10   of Tessera's showing of infringement in that

11   investigation that you found helpful in any way in

12   your work on this case?

13       A.   Again, no.  Nothing that I can

14   specifically refer to that I thought really was

15   useful in that sense.  Let me clarify.

16          Certainly useful in terms of discovery of

17   understanding how people were thinking about the

18   interpretation of the claim language and of the

19   patents.

20          But nothing that was specifically

21   relevant, I thought, scientifically that -- or from

22   an engineering perspective that would have altered

23   my opinion, other than being informative.

24       Q.   Would it be fair to say that you gave the

25   International Trade Commission and the Federal

1    Circuit that reviewed the work of the International

2    Trade Commission no weight in your work in this

3    case?

4         A.   No --

5              MR. ANDERSON:  Sorry.  Let me get an

6    objection in, Dr. Dauskardt.

7              So I'm going to object to this continuing

8    line of questions, inasmuch as you are asking him

9    about these decisions that you have not provided to

10   him.

11             THE WITNESS:  Can you ask the question

12   again?

13   BY MR. OLSON:

14        Q.   Sure.  Would it be fair to say that you

15   gave no weight to the opinions of the International

16   Trade Commission and the Federal Circuit reviewing

17   the International Trade Commission in the '605

18   investigation, that you gave those opinions no

19   weight in your work on this case?

20             MR. ANDERSON:  Also, objection.  Misstates

21   testimony.

22             THE WITNESS:  I don't believe it would be

23   true to say that I gave -- I gave it no weight.

24             I think, as I said a little while ago, I

25   read it as part of my own discovery of the case, as

1   part of how other people had thought about these --

2   about the case.

3         And inasmuch as there might have been

4   information there that would have been, in my

5   opinion, relevant scientifically or from an

6   engineering point of view, then I most certainly

7   would have given that weight in my decision.

8         I am trying now to remember anything

9   specific, and right off the top of my head, I can't

10  think of anything specific, although it might have

11  been part of the claim language with respect to

12  movement related to external forces was specifically

13  agreed to in those cases.

14        But I'm not remembering exactly.  But that

15  would have been an example where I would have looked

16  at that from an engineering perspective and said,

17  "That makes sense.  I agree with that."

18        And so inasmuch as any of that information

19  was there, I most certainly would have given it

20  weight.

21  BY MR. OLSON:

22     Q.   You mentioned earlier in your discussions

23  with ST's lawyer that some things previously decided

24  by Judge Wilken regarding these patents, you had in

25  essence deemed resolved; is that a fair way of

1    saying what you said before?

2             MR. ANDERSON:  Objection.  Misstates

3    testimony.

4             THE WITNESS:  Well, I -- I certainly, and

5    I believe I have this in my report, have accepted

6    the interpretation by the Court, by Judge Wilken,

7    that the movement that is claimed in the patents is

8    related to the application of external force and

9    leads to the appreciable reduction of mechanical

10   stress.

11            My understanding from the experts' reports

12   and the experts' testimony is that that has been the

13   interpretation of the Court.  And so I have -- I

14   have accepted that, and as I said, I agree with

15   that.

16            If I had not agreed with that

17   interpretation, I would have said so.

18            And in fact, when I first read it, I had

19   to think about it for a while to make sure that this

20   was consistent with my understanding of the patents

21   and the operation of the device and the claims.

22            So I would not, even if it were a ruling

23   by the present Court, have simply accepted it if it

24   was not scientifically and technically valid.

25

179

1    BY MR. OLSON:

2        Q.   Are there any other rulings by the present

3    Court that you reviewed and disagreed with?

4        A.   No.

5        Q.   Have you reviewed Judge Wilken's rulings

6    regarding, for instance, anticipation by the OMPAC

7    package?

8        A.   No.

9        Q.   Okay.  Well, she has reviewed arguments of

10   anticipation by the OMPAC package of -- and issued a

11   ruling.

12            And just to help me understand what you --

13   you agree with and what you disagree with, I would

14   like to walk through that, if we could, so I could

15   understand the basis for your disagreement and

16   reaching a different conclusion than Judge Wilken.

17            So let me hand you what I have marked as

18   Exhibit 19.

19            (Whereupon, Exhibit 19 was marked for

20   identification.)

21   BY MR. OLSON:

22       Q.   That's are excerpts from a opinion by

23   Judge Wilken on the anticipation by OMPAC, and

24   understand from a scientific basis where there is

25   agreement and where there is disagreement.

1   the Court did make it and it's written.

2        Q.   Okay.

3        A.   I would agree with that.

4        Q.   So do you agree that the Court made the

5   statement?

6        A.   I did.

7        Q.   Well, my second question is, do you agree

8   with the substance of the statement, that

9   "incidental movement within the OMPAC package was

10  not intended to and does not appreciably relieve

11  mechanical stress"?

12       A.   I would agree with the statement that

13  incidental movement was not designed to relieve

14  mechanical stress.

15            But in those OMPAC packages, I don't have

16  specific information on whether there was any stress

17  relief or not associated with these incidental

18  movements.

19       Q.   You understand, sir, in this case that the

20  defendants bear the burden of proof to show that the

21  patent is invalid; do you understand that?

22       A.   I do.

23       Q.   And in this case have the defendants given

24  any testing information whatsoever about the OMPAC

25  package?

1        But I think if you look at my section that

2   I wrote on anticipation, then I did not state that

3   opinion in that way in this section.

4   BY MR. OLSON:

5        Q.   I'm just trying to --

6        A.   In other words, what I was trying to do in

7   the section on anticipation was to find existing

8   art, prior art, that would anticipate the Tessera

9   patents or would have anticipated the Tessera

10  patents.

11       That did not, in that section, include the

12  OMPAC package.  However, as I note subsequently, if

13  one broadly construes the claim limitations in the

14  Tessera patents, then they would be anticipated by

15  the OMPAC package.

16       So in that sense, I would agree that they

17  anticipate the Tessera patents, because the Tessera

18  patents don't have sufficient claim limitations by

19  which movement and stress relief in the OMPAC

20  package could be distinguished from what might

21  happen in the Tessera patents.

22       Q.   Is it your opinion that the 1989 OMPAC

23  package anticipates all of the asserted claims of

24  the '977 patent?

25       A.   In the way the '977 patent is written,

1    without sufficient claim limitations, then I would

2    agree with that, yes.

3        Q.   And, therefore, it's your view that the

4    OMPAC package appreciably relieves mechanical

5    stresses, correct?

6        A.   Since the word "appreciable" is not

7    defined in the Tessera patents, it could be any

8    stress relief.

9            There is no definition of the word

10   "appreciable."  It could be a millionth of a percent

11   or it could be a hundred percent.  There is no way

12   to make that determination.

13           And in fact, as you can see in all of the

14   expert testimony here, it's been almost impossible

15   for those stresses to be properly defined and

16   calculated.

17           So I know this is a difficult and a subtle

18   point, but the fact is, since the claims in '977 and

19   the other patents, the other Tessera patents provide

20   no claim limitations, then any stress relief could

21   be appreciable.

22           There is no definition of the word

23   "appreciable."  Nobody would be able to interpret

24   that.

25       Q.   And under that interpretation of the

Reinhold Dauskardt

Page 223

1      A.   Well, as I have described in my report,
2   any package would exhibit such motion.
3           And the description in many of these
4   reports, if not all of these reports, of a
5   multilayered package structure containing different
6   materials with different thermal expansion
7   properties would necessarily imply that these
8   motions would be present.
9      Q.   Okay.  How much motion would be present in
10  the OMPAC package?
11     A.   The exact extent of the motion would have
12  to be calculated.  It's something that is knowable.
13  It's potentially measurable.  But I can't tell you
14  now exactly how much it is.
15     Q.   And nobody in this case has calculated
16  the --
17          MR. ANDERSON:  Objection.  Vague.
18  Overbroad.
19          MR. DANE:  Will you please not interrupt
20  the question in the middle of the question?
21  BY MR. OLSON:
22     Q.   Nobody in this case has calculated how
23  much movement is in the OMPAC package, so --
24          MR. ANDERSON:  Just as a matter of
25  protocol, Dr. Dauskardt, if I could ask you, please,

Page 225

1   the 1989 OMPAC package?

2           MR. ANDERSON:  Objection.  Argumentative.

3   Vague and overbroad.  Asked and answered.

4           THE WITNESS:  I -- thinking through all of

5   the materials that I have looked at, I don't recall

6   seeing that.  That doesn't mean it doesn't exist,

7   but I don't recall seeing it.

8           Can you give me an example of this

9   package, who -- a designation number?

10  BY MR. OLSON:

11      Q.   It's referred to at length in

12  Dr. Schaper's report, sir.

13      A.   Uh-huh.  Yes, I have read Dr. Schaper's

14  report.

15      Q.   Okay.  Has anyone in this case

16  calculated -- well, let me back it up, ask a

17  different question.

18          You also claim the Mullen reference

19  anticipates these patents, Tessera's patents,

20  correct?

21      A.   The Mullen patents anticipate the

22  patents-in-suit, yes.

23      Q.   Okay.  Has anyone -- do you know how much

24  movement, if any, exists in the Mullen patent?

25      A.   Inasmuch as we don't know how much motion

Reinhold Dauskardt

Page 226

1    exists for any of the packages that might be built

2    based on the current patents-in-suit, then we also

3    do not know currently how much motion exists in

4    those packages.

5          Q.   Okay.  In the Mullen patent?

6          A.   In the Mullen patent.

7          Q.   And nobody in this case has done any

8    calculation of how much movement is in the Mullen

9    package, correct?

10          MR. ANDERSON:  Objection.  Vague,

11   overbroad.

12          THE WITNESS:  That's -- that's my

13   understanding.

14   BY MR. OLSON:

15          Q.   Do you know how much motion exists in the

16   Lin patent -- I mean, excuse me, do you know how

17   much movement exists in the Lin patent?

18          A.   I currently do not.  If that information

19   has been published or if it is in the materials that

20   have been provided to me, then I am not recalling it

21   at the moment.

22          Q.   Okay.  And you understand, sir, when I use

23   the word "movement," I'm referring to movement as we

24   have been discussing today as it is defined in the

25   claim construction?

Reinhold Dauskardt

Page 227

1      A.    The claimed movement --

2      Q.    Yes.

3      A.    -- and not all of the other movements.

4      Q.    Correct.

5      A.    I understand.

6            MR. ANDERSON:  Objection.  Vague.

7   BY MR. OLSON:

8      Q.    Has anyone in this case calculated how

9   much claimed movement is in the Lin patent?

10     A.    Again, as I sit here thinking about the

11  materials that I have reviewed, I do not -- I

12  cannot -- cannot remember any number.

13     Q.    Do you know how much claimed movement

14  exists in the Freyman patent?

15           MR. ANDERSON:  So --

16           THE WITNESS:  My answer is the same.

17  BY MR. OLSON:

18     Q.    You don't know?

19           MR. ANDERSON:  Sorry.  Sorry.  Objection.

20  Objection.  I'm going to object to the continuing

21  use of this phrase "claimed movement" without some

22  definition on the record of what claim counsel is

23  referring to.

24  BY MR. OLSON:

25     Q.    Do you have my question in mind, sir?

Reinhold Dauskardt

Page 228

1          A.    Can you repeat the question?

2          Q.    Do you know how much claimed movement

3     exists in the Freyman patent?

4               MR. ANDERSON:  Same objection.

5               THE WITNESS:  And the same answer that I

6     have given you for the others.

7     BY MR. OLSON:

8          Q.    You don't know?

9          A.    I don't recall seeing any of that motion

10    calculated.  It would exist, but I can't tell you

11    here from memory whether it was calculated or

12    measured.

13         Q.    Okay.  Okay.  And you don't know whether

14    anyone in this case has done any measurements of the

15    movement, the claimed movement in the Freyman

16    package, correct?

17         A.    Correct.

18         Q.    Do you know how much claimed movement

19    exists in the Okinaga package?

20         A.    I do not.

21               MR. ANDERSON:  Same objection.

22    BY MR. OLSON:

23         Q.    Has anyone in this case measured how much

24    claimed movement exists in the Okinaga package?

25         A.    Not to my knowledge.

Reinhold Dauskardt

Page 229

1          MR. ANDERSON:  Objection.

2          Okay.  Hold on.

3     BY MR. OLSON:

4          Q.   Do you know how much movement exists in

5     the Hatada package?

6          MR. ANDERSON:  Hold on.  I need to have an

7     opportunity to state my objection.

8          THE VIDEOGRAPHER:  Microphone.

9          MR. ANDERSON:  Oh.  Usually it falls off

10    if you get up.  Okay.  Oh, I can see.  All right.

11         Pardon me, Counsel.

12         Objection.  The question is vague and

13    overbroad and, again, object to the lack of a

14    definition for the phrase "claimed movement."

15    BY MR. OLSON:

16         Q.   So do you have any doubt in your mind what

17    I mean when I am asking about the claimed movement?

18         A.   Perhaps if you can state it for the

19    record --

20         Q.   I think, well, as we have been

21    discussing --

22         A.   -- then we'll all be much happier.

23         Q.   -- it's the claimed movement as described

24    in the patent claims at issue in this case?

25         MR. ANDERSON:  Same objection.

Reinhold Dauskardt

Page 230

1            THE WITNESS:  I understand that.

2   BY MR. OLSON:

3      Q.   Okay.  And do you know how much claimed

4   movement exists in the Hatada package?

5            MR. ANDERSON:  Same objection.

6            THE WITNESS:  The same answer that I have

7   given you for the last number of questions.

8   BY MR. OLSON:

9      Q.   And to make sure the record is clear, you

10  don't know how much claimed movement is in Hatada?

11     A.   I don't recall whether anybody has

12  reported that here.

13           MR. ANDERSON:  Again, Dr. Dauskardt, so we

14  can create a clean record, the protocol should be

15  counsel states his question.  If I have an

16  objection, I need an opportunity to object.

17           THE WITNESS:  Okay.

18           MR. ANDERSON:  And that will just make

19  sure that what we're doing here is accurately

20  recorded.

21           My objection to that question is it

22  misstates prior testimony.

23  BY MR. OLSON:

24     Q.   You don't know how much claimed movement

25  is in the Hatada package and you don't know whether

Reinhold Dauskardt

Page 231

1   anyone has measured the amount of claimed movement

2   in the Hatada package, correct?

3            MR. ANDERSON:  Objection.  Vague.

4   Overbroad.

5            THE WITNESS:  I do know that there would

6   be claimed movement in the Hatada package.  I don't

7   know from information that I have how much that

8   movement is.

9   BY MR. OLSON:

10       Q.   Okay.  Do you know the amount of stress

11  relief that exists in the OMPAC package as a result

12  of the claimed movement?

13           MR. ANDERSON:  Objection.  Vague.

14           THE WITNESS:  Are you asking for a

15  specific number or a percentage --

16  BY MR. OLSON:

17       Q.   I'm asking --

18       A.   -- or just whether there would?

19       Q.   -- what you know.

20       A.   There would be some stress relaxation.

21       Q.   How much?

22       A.   I don't know the amount.

23       Q.   Has anyone in this case calculated the

24  amount of stress relief that exists in the OMPAC

25  package as a result of the claimed movement?

Reinhold Dauskardt

Page 232

1           MR. ANDERSON:  Objection.  Overbroad.
2    Asked and answered.
3           THE WITNESS:  If the OMPAC package is
4    distinct from the accused package, then I don't know
5    if that has been calculated.  It has been estimated
6    for the accused packages.
7    BY MR. OLSON:
8       Q.   You are referring to Dr. Fan's analysis in
9    this case?
10      A.   I'm referring to -- I believe either
11   Dr. Dasgupta or Dr. Lall's estimation based on
12   Dr. Fan's calculations, correct.
13      Q.   I'm referring to the 1989 OMPAC package,
14   which is not an accused package in this case.  Has
15   anyone measured or quantified the amount of stress
16   relief that exists in the 1989 OMPAC package as a
17   result of the claimed movement?
18      A.   Not to my knowledge.
19           MR. ANDERSON:  Hold on.
20           THE WITNESS:  Sorry.
21   BY MR. OLSON:
22      Q.   Is the --
23           MR. ANDERSON:  Hold on.  Hold on.
24           Objection.  The question has been asked
25   and answered.  It is also argumentative.  And it's

Reinhold Dauskardt

Page 233

1   vague.

2   BY MR. OLSON:

3       Q.   Has anyone -- well, let me ask the

4   question a different way.

5            Do you know the amount of stress relief

6   that exists in the -- in any of the Lin, Hatada,

7   Okinaga, or Freyman references as a result of the

8   claimed movement?

9            MR. ANDERSON:  Objection to the form.

10           THE WITNESS:  I do know that there would

11  be some relaxation of stress, but I don't know how

12  much it would be.

13  BY MR. OLSON:

14      Q.   Has anyone in this case measured the

15  amount of stress relief that exists in the Lin,

16  Hatada, Okinaga, or Freyman reference as a result of

17  the claimed movement?

18           MR. ANDERSON:  Objection to --

19           THE WITNESS:  Not to my knowledge.

20           MR. ANDERSON:  Objection to the form.

21           THE VIDEOGRAPHER:  Dr. Dauskardt, could

22  you raise your mic, please?

23           THE WITNESS:  Sure.

24           THE VIDEOGRAPHER:  Up to -- up to that top

25  button there.

Reinhold Dauskardt

Page 234

1           (Whereupon, a brief discussion off the

2    record.)

3    BY MR. OLSON:

4        Q.   Dr. Dauskardt, do you know the amount of

5    stress relief that exists in the Mullen reference as

6    a result of the claimed movement?

7           MR. ANDERSON:  Object to the form.  Asked

8    and answered.

9           THE WITNESS:  I do not.

10   BY MR. OLSON:

11       Q.   Has anyone in this case measured how much

12   stress relief exists in the Mullen package due to

13   the claimed movement?

14          MR. ANDERSON:  Object to the form.  Asked

15   and answered.

16          THE WITNESS:  Can you tell me what the

17   Mullen package is?

18   BY MR. OLSON:

19       Q.   I believe you discussed it with

20   Mr. Anderson yesterday.

21       A.   There is a Mullen patent.

22       Q.   Covering a package, correct?

23       A.   Correct.

24       Q.   Okay.  So I'm referring to the package

25   described in the Mullen patent.

Reinhold Dauskardt

Page 235

1        A.    Okay.

2        Q.    Does that change your answers in any way

3   about Mullen?

4        A.    Well, it just clarifies for me what you

5   mean by "the Mullen package," because I only know of

6   a Mullen patent.

7        Q.    Okay.

8        A.    I do not believe that I have seen that

9   information.

10       Q.    And to make sure the record is clear, the

11  information you are referring to is any measurement

12  of the stress relief that exists in the Mullen

13  package as a result of the claimed movement?

14       A.    Correct.

15       Q.    Okay.  Dr. Dauskardt, I would like now to

16  turn to a little bit more of the background work

17  that you have done in this case.

18            And you mentioned yesterday that you had

19  reached an opinion before you received the summary

20  reports put together by the parties.

21            Do you remember that statement yesterday?

22       A.    I do, yes.

23       Q.    And I would like to know a little bit

24  about when you reached your opinion that or when you

25  first concluded that the patents were invalid.

Page 246

1            And in my mind, I found it very useful in

2    understanding the legal framework for the case.

3    BY MR. OLSON:

4        Q.   What legal standard did you have the

5    hardest time understanding?

6            MR. ANDERSON:  Objection.  Vague.

7            THE WITNESS:  I'm not sure that there was

8    any one that I decided was more difficult than any

9    other.

10   BY MR. OLSON:

11       Q.   Do you feel that you understand all of the

12   legal standards -- let me back up.

13           Is your analysis in this case based on

14   your view that you have understood and applied the

15   legal standards correctly?

16           MR. ANDERSON:  Object to the form.

17           THE WITNESS:  Yes, it is.

18   BY MR. OLSON:

19       Q.   One of the terms that you are critical of

20   in the patents or in their construction is the

21   notion of appreciable stress relief.  You said that

22   is indefinite, correct?

23           MR. ANDERSON:  Objection to the prologue.

24   Argumentative.

25           THE WITNESS:  Correct.

Reinhold Dauskardt

Page 247

1    BY MR. OLSON:

2        Q.   In your view, does the term "appreciable"

3    provide some limitation on the amount of stress

4    relief?

5        A.   No.

6        Q.   So appreciable stress relief, in your

7    view, is synonymous, the same as, stress relief?

8             MR. ANDERSON:  Objection.  Misstates

9    testimony.

10            THE WITNESS:  That's correct.

11            If you are an engineer in any field and

12   are told to design something with appreciable

13   reduction of some property, then without further

14   limitation, you would have absolutely no idea of how

15   much that amount should be.

16   BY MR. OLSON:

17       Q.   Your concerns would be the same if

18   Tessera's patents just required stress relief,

19   correct?

20            MR. ANDERSON:  Objection.  Vague.

21            THE WITNESS:  I'm not sure I understand.

22   BY MR. OLSON:

23       Q.   Well, the term "movable" has been

24   construed to require, among other things,

25   appreciable stress relief, correct?

Reinhold Dauskardt

Page 283

1   BY MR. OLSON:

2        Q.   Does it give you any pause that you have

3   found prior art that you claim anticipates Tessera's

4   patents that no one else has asserted in any of the

5   many cases about these patents?

6             MR. ANDERSON:   Objection.   Lacks

7   foundation.   Argumentative.   Object to the form.

8             THE WITNESS:   Counselor, to give you an

9   example, I was recently reading about a theory in

10  decision-making that was formed by Bernuli 300 years

11  ago.

12            And for 300 years, this theory was not

13  challenged, up until ten years ago, it was accepted

14  as an established theory in decision-making.   It had

15  not been challenged for 300 years.

16            The fact that nobody else formed this

17  opinion on anticipation did not overly concern me.

18            I think my opinion here is that a lot of

19  the experts were focused on very specific aspects of

20  anticipation, and I thought that as the Court's

21  expert, I could and should take the broadest

22  possible view in the interpretation of anticipation.

23            And that's what I did.   And so I'm not

24  concerned that nobody else raised this issue.

25

Reinhold Dauskardt

1          A.    This is the only example I used.

2          Q.    Okay.  But what you are saying is, if you

3    modify the example you show in your report, you

4    could modify it such that it would anticipate the

5    patents?

6                MR. ANDERSON:  Object to the form.

7                THE WITNESS:  Again, this was one of many

8    possible examples that I could use.  Maybe this

9    example would have anticipated the other patent.

10   I'm forgetting the number, the first patent, '977, I

11   believe.

12   BY MR. OLSON:

13         Q.    Can you point to any dual in-line package

14   that has leads underneath the die?

15         A.    Not as I sit here now.

16               MR. ANDERSON:  Object to the form.

17               THE WITNESS:  No.

18   BY MR. OLSON:

19         Q.    Can you point to any evidence by anyone in

20   the case that such a package exists?

21               MR. ANDERSON:  Objection.  Vague.

22   Overbroad.

23               THE WITNESS:  As you questioned earlier

24   on, nobody else has formed this particular set of

25   comments and discussion on anticipation.

Reinhold Dauskardt

Page 297

1   carrier, there could be terminals underneath the

2   chip in the leadless chip carrier.

3        Q.   Do you identify any leadless chip carriers

4   that actually have terminals underneath the chip?

5        A.   No, I do not.

6        Q.   Okay.  And to be clear, if you turn to

7   page 77 of Dr. Schaper's report, you see Claim 17 of

8   the '977 patent?

9        A.   Sorry, I'm sorry, the page number again?

10       Q.   77.

11       A.   77.

12       Q.   And you see that Element B says, "A

13   plurality of terminals, at least some of said

14   terminals overlying one said surface of said chip."

15            Do you see that?

16       A.   I do.

17       Q.   So you agree that terminals overlying the

18   chip is an element common to both the '977 and '326

19   patents?

20            MR. ANDERSON:  Object to the form.  Calls

21   for a legal conclusion.

22            THE WITNESS:  Yes, I do.

23   BY MR. OLSON:

24       Q.   Okay.  Sir, now I want to talk to you

25   about your obviousness opinion.  If we turn to page

Page 335

1        Q.    Now, I want to talk to you about your

2   written -- written description portion of your

3   report.  And, first, turn to page 41.

4              And in the second full paragraph you refer

5   to the claim limitations in the '977 patent and the

6   '326 patent and quote from the claims, correct?

7        A.    Yes, correct.

8        Q.    Your analysis of these claims forms the

9   basis of your opinion that the patents are not valid

10  for failure to meet the written description

11  requirements, correct?

12             MR. ANDERSON:  Object to the form.

13             THE WITNESS:  That's -- this is certainly

14  part of my concern about the ability of somebody to

15  practice the invention with this written

16  description.

17  BY MR. OLSON:

18       Q.    Did you look at the additional information

19  provided in the patent outside of the claims in

20  forming your written description opinion?

21       A.    Yes, I did.

22       Q.    But you don't cite any of that in your

23  discussion?

24       A.    No, I don't.  I -- I cited language in the

25  claim limitations themselves, as those typically

Reinhold Dauskardt

Page 336

1    have the most precise language with respect to what

2    is claimed.

3            I didn't use other examples in the patent,

4    but I certainly had, of course, read them and taken

5    them into account.

6        Q.   On page 38, you state in the second to the

7    last paragraph, "A person of ordinary skill in the

8    field could not determine the extent of movement

9    related to external forces that would be required to

10   make and use the invention as claimed."

11           Do you see that?

12       A.   Yes.

13       Q.   "And in order to do that, they would need

14   to engage" -- "In order to determine the extent of

15   movement related to external forces, they would need

16   to engage in excessive experimentation," correct?

17       A.   That's correct, to fully use the

18   invention.

19       Q.   What kind of experimentation would be

20   required?

21       A.   Well, I did not do a full analysis of all

22   the experimental analysis that would be needed.

23           But presumably they would have to

24   determine the kind of motion that was claimed in the

25   patent and figure out experimental techniques in

Reinhold Dauskardt

Page 342

1          MR. ANDERSON:  I object to that statement

2     of the law.

3          THE WITNESS:  Well, that is my

4     understanding of what she has decided.  As I have

5     said here on page 38, my understanding that the

6     Court has previously interpreted "movement" and

7     "movable" as what you have just said.

8          So that's my understanding.

9     BY MR. OLSON:

10         Q.   Okay.  Do you disagree with Judge Wilken's

11    conclusion that one skilled in the art would

12    interpret "movable" as displacements resulting from

13    external loads that appreciably relieve stresses?

14         MR. ANDERSON:  Object to the form.

15         THE WITNESS:  No, I don't disagree with

16    that.

17    BY MR. OLSON:

18         Q.   But you believe that in order to overcome

19    the written description defense, Tessera is required

20    to distinguish the claimed movement from all other

21    movements in the package?

22         A.   Well, again, as I have described in my

23    opinion and in my report, there is lots of movement

24    in a microelectronic package and in a

25    microelectronic package assembly.

Reinhold Dauskardt

Page 346

1    invention.

2            The way it's described, again, I think, as

3    I have said clearly in my section on written

4    description and also then referred to in my section

5    on infringement, literally every microelectronic

6    package would practice this invention.

7            There is no written -- there is no

8    limitation here.  Every device that's made would

9    contain some of this movement and would contain

10   stresses that were changed from some other

11   condition, some referenced condition.

12           And so every package ever made really

13   would fall under the -- the description of this

14   particular patent.  It's -- there is no limitation.

15   That was my opinion.

16   BY MR. OLSON:

17       Q.   One way to improve the written description

18   would have been to have some limitation on the

19   required stress reduction, correct?

20       A.   One possibility would have been to have

21   some limitation on the required stress reduction.

22   Another could have been related to how much motion

23   was required.

24       Q.   And the limitation could have been

25   presented as a percentage of stress reduction, for

Reinhold Dauskardt

Page 353

1        A.    That's correct.

2        Q.    So someone of skill in the art reading the

3   specification when the patent was filed would

4   already know how to make a DIP or LCC that you say

5   practices the invention, correct?

6        A.    When you say, "skilled in the art," I

7   mean, I think I am really thinking about somebody of

8   ordinary skill.

9        Q.    That's what I meant.

10       A.    Skilled in microelectronic.

11       Q.    So let me ask you using it, to be clear.

12       A.    Right.

13       Q.    Someone of ordinary skill in the art

14   reading the specification when the patent was filed

15   would already know how to make a dual in-line

16   package, a DIP, or LCC, a leadless chip carrier that

17   you said -- that you say practices the invention,

18   correct?

19       A.    That's right.  They would have been able

20   to anticipate from that prior art what is disclosed

21   in the -- in the -- in the present patents.

22       Q.    You discuss CTE matching in your report

23   several places.

24       A.    Yes, I do.

25       Q.    What do you mean -- well, let me ask it

Reinhold Dauskardt

Page 359

1    BY MR. OLSON:

2         Q.    Same with die-attach?

3         A.    Same with die-attach.

4         Q.    In the accused packages, does the package

5    substrate include solder mask and die-attach?

6         A.    Yes, it does.

7         Q.    Is that the interpretation used by the ITC

8    in their opinion in the '605 case, that the package

9    substrate included the die-attach and solder mask

10   layers?

11        A.    I -- Counsel, I simply don't remember.  I

12   would have to -- you would have to refer me to the

13   sections of these reports where that is included.

14        Q.    Let me hand you what has been marked as

15   Exhibit 31.

16             (Whereupon, Exhibit 31 was marked for

17   identification.)

18   BY MR. OLSON:

19        Q.    Do you recognize Exhibit 31 as the

20   decision of the International Trade Commission in

21   the '605 case?

22        A.    I'm not sure I recognize this.

23        Q.    Have you ever read the decision of the

24   International Trade Commission listed as -- marked

25   as Exhibit 31?

Reinhold Dauskardt

Page 360

1      A.   I have seen reference to it in several of
2   the expert reports, and you might have also
3   mentioned it in your summary report to me, but I
4   have not read in detail this publication.
5      Q.   Have you read it at all?
6      A.   If it is in the materials that were
7   supplied to me, I'm sure at some stage I would have
8   looked at it.
9           It might have been early on in my
10  discovery, which would have been over a year ago,
11  and I do not remember the details of -- of whether I
12  read it in -- or read portions of it.
13     Q.   If you turn to page 32 of the commission's
14  decision, do you see at the bottom there is a quote
15  from the initial determination, and then it says,
16  "In numerous places in the initial -- the ID initial
17  determination, the ALJ clearly states that CTE
18  matching is between the package substrate and the
19  printed circuit board"?
20          Do you see that?
21     A.   Yes, I see that sentence.
22     Q.   And then they continue to say, "The ALJ is
23  completely consistent in defining 'CTE matching' as
24  matching the CTE of the package substrate as opposed
25  to the package overall to the CTE of the PCB."

Reinhold Dauskardt

Page 408

1   field.

2        Q.   But you are not saying -- excuse me.  Let

3   me back up.

4             But you are not saying that LCCs have wire

5   bonds, are you, if they have pins, like you

6   describe?

7        A.   No, they might not have wire bonds.  I

8   don't know that all leadless chip carriers might not

9   have wire bonds.

10             But I'm talking here about the basic

11   engineering principle and whether, by knowing about

12   these leadless chip carriers and knowing they are

13   been designed with flexible elements and with

14   compliant layers in order to address problems of

15   fatigue damage of solder connections, then they

16   would be the same kind of strategy that might be

17   adopted and that would anticipate the claims of

18   the -- of the present patents.

19        Q.   Can you identify, sitting here today, any

20   LCC that does have wire bonds?

21             MR. ANDERSON:  Objection.  Overbroad.

22   Vague.

23             THE WITNESS:  No, no, I can't.  And as I

24   said, I don't think that's pertinent, though.

25

Reinhold Dauskardt

Page 409

1    BY MR. OLSON:

2         Q.   Now, I want to talk to you a little bit

3    about your invalidity opinions, just to make sure I

4    understand it.

5              Is it fair to say that, in your opinion,

6    the patent claims are invalid because they do not

7    define or specify the amount of stress relief that

8    results from the terminal to chip displacement made

9    possible by the compliant layer?

10             MR. ANDERSON:   Object to the form.

11             THE WITNESS:   I'm sorry, you'll, please,

12   ask that question again.

13   BY MR. OLSON:

14        Q.   Is it fair to say that, in your opinion,

15   the patent claims are invalid because they do not

16   define or specify the amount of stress relief that

17   results from the terminal to chip displacement made

18   possible by the compliant layer?

19        A.   Yes, that's correct.  And that refers to

20   my opinion on validity, yes.

21        Q.   In your view, every semiconductor package

22   containing compliant materials would show some --

23   let me ask the question without misspeaking.

24             In your view, every semiconductor package

25   containing compliant materials would show some

Reinhold Dauskardt

Page 466

 1      A.   That's my understanding.

 2      Q.   Do you understand that it came from a

 3 judicial tribunal?

 4           MR. ANDERSON:  Objection.  Asked and

 5 answered.

 6           THE WITNESS:  Well, if that's what you are

 7 telling me, then...

 8 BY MR. OLSON:

 9      Q.   Okay.  How did you decide which

10 limitations or disclaimers outside of the patent to

11 adopt in this case and which ones to question?

12      A.   Well, I questioned everything, including

13 the interpretation by Judge Wilken.  In fact, I

14 remember vividly the day that I read that

15 interpretation, and I thought, What would happen if

16 I disagreed with the judge.

17           And though thinking through it, after

18 initially reading it, I realized that that was an

19 appropriate limitation on the movement, the required

20 movement, and it was consistent with my

21 understanding of the patents.

22           And it was also consistent with what I

23 understood all of the experts in the case to agree

24 to.

25      Q.   Your -- to make sure the record is clear,

Page 467

1   what you are talking about is the limitation due to
2   external forces, requiring it to be due to external
3   forces?
4        A.   It's what I understand to be the claimed
5   movement.
6        Q.   Okay.  To make sure there is no confusion,
7   what do you understand to be the claimed movement?
8        A.   The claimed movement, as I have written
9   several times in my written opinion, is the movement
10  related to the external force that results in
11  appreciable reduction of stress.
12       Q.   This movement is the movement that you say
13  is appropriate, even though it has no metes or
14  bounds on its description?
15            MR. ANDERSON:  Object to the form.
16            THE WITNESS:  The claim limitations place
17  no bounds on this movement, that's correct.
18  BY MR. OLSON:
19       Q.   Even though you view it's appropriate,
20  Judge Wilken's construction is appropriate, you view
21  that this leads to the patent being indefinite?
22            MR. ANDERSON:  Objection to the form.
23            THE WITNESS:  That would be correct.
24  BY MR. OLSON:
25       Q.   So how is it appropriate, then?

Reinhold Dauskardt

Page 468

1           MR. ANDERSON:  Object to the form.
2           THE WITNESS:  How is what appropriate?
3   BY MR. OLSON:
4       Q.   You just said that Judge Wilken's
5   definition of claimed movement was one that you view
6   as appropriate, yet it has no metes and bounds and
7   leads to the patent being found indefinite.
8           And my question is, how, with that
9   outcome, is Judge Wilken's definition of claimed
10  movement appropriate?
11      A.   Well, I --
12          MR. ANDERSON:  Counsel, object to the
13  form.  Argumentative.  Calls for a legal conclusion.
14          THE WITNESS:  It was not my opinion in
15  reviewing all of these materials and in reviewing
16  the interpretation by the Court of the claimed
17  motion or movement that that would necessarily
18  validate the claims.
19          Some movement has to be defined, otherwise
20  we could allow any possible movement.
21          And so in the context of what had been
22  agreed to between the plaintiffs and the defendants,
23  what had been described by Judge Wilken, I found
24  that to be an appropriate definition.
25          It was something that, if the invention

Reinhold Dauskardt

Page 469

1   were valid, would have constituted any invention.

2   There had to be something.  It couldn't be

3   everything.

4           And so that claimed movement is something

5   that I think was appropriately agreed to by both

6   sides, and from what I see, it was affirmed by the

7   judge.  And so I think that is what I have accepted,

8   and which I think is correct.

9           And I don't think that, because the patent

10  is without limit, necessarily means that this

11  definition or this understanding of the claimed

12  movement is wrong.

13  BY MR. OLSON:

14      Q.   You discussed this claimed movement just

15  now with ST's lawyer.

16          And I believe he characterized it as broad

17  and you agreed with that, correct?

18          MR. ANDERSON:  Objection.

19  Mischaracterizes the question and answer.

20          THE WITNESS:  No, I am not sure where I

21  would have said it's broad.  I have certainly

22  considered many aspects of the -- the claim

23  limitations to be broad, but I'm not sure what you

24  mean specifically.

25

Reinhold Dauskardt

Page 471

1          Q.   If the patent is found to be valid, it's
2    your view that under that definition proposed by ST,
3    that any package would infringe the patent, correct?
4          A.   Yes, that's correct.
5               MR. ANDERSON:   Object.   Object to the
6    form.
7               THE WITNESS:   That would necessarily be
8    the case.
9               (Reporter clarification.)
10   BY MR. OLSON:
11         Q.   Is the basis for your infringement opinion
12   that if the packages do infringe the patent, then
13   they are just practicing the prior art?
14         A.   That's right.
15         Q.   I want you to turn to the International
16   Trade Commission's decision.   I think it's
17   Exhibit 21.   And if you could turn to pages 17 and
18   18 -- actually, the bottom of 17, and the second
19   sentence in that bottom paragraph of page 17.
20         A.   Exhibit 21.
21         Q.   Oh, I'm sorry.   I must have my notes
22   wrong.   The International Trade Commission decision.
23              MR. DETRE:   Exhibit 31.
24   BY MR. OLSON:
25         Q.   31, excuse me.